# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| A.V. and AARON VANN, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No.  4:21-CV-00508 |
| | § | Judge Mazzant |
| PLANO INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| *Defendant*. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER AND
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On July 2, 2021, Plaintiffs A.V. and Aaron Vann filed their original Complaint against Defendant Plano Independent School District (Dkt. #1). Plaintiffs assert that Plano Independent School District violated A.V.'s and Aaron Vann's due process rights under the Fourteenth Amendment and 42 U.S.C. § 1983 by disciplining A.V. for allegedly violating an anti-cyberbullying policy.

On October 21, 2021, the Court held a bench trial in the above-styled matter. After considering the parties' arguments and the evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1] To the extent that

---

[1] In preparing this memorandum opinion and order, the Court carefully considered the pretrial filings, trial testimony, trial exhibits, and post-trial briefing and subsequently applied the Fifth Circuit standard for findings and conclusions under Federal Rule of Civil Procedure 52. *See Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 935–36 (5th Cir. 2019); *see also* 9C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2579 (3d ed.). Since the "findings of fact and conclusions of law must be 'sufficient in detail and exactness to indicate the factual basis for the ultimate conclusion reached,'" *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 819 (5th Cir. 2020) (quoting *Lettsome v. United States*, 434 F.2d 907, 909 (5th Cir. 1970)), the Court "need only make brief, definite, pertinent findings and conclusions upon the contested matters." FED. R. CIV. P. 52(a), advisory committee's note to 1946 amendment. This standard does not require the Court to "expressly respond like a debate champion to every evidentiary or factual contention made by the losing side." *Richard v. Reg'l Sch. Unit 57*, 901 F.3d 52, 59 (1st Cir. 2018); *see Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (collecting cases).

The facts contained herein are either undisputed or the Court has made such findings based on the credibility or believability of each witness. In doing so, the Court considered all circumstances under which the witnesses testified, including: the relationship of a witness to the parties; the interest, if any, a witness has in the outcome of the

any of the findings of fact constitute conclusions of law, or any of the conclusions of law constitute findings of fact, they are adopted as such.

## FINDINGS OF FACT

At the time the underlying incident occurred, A.V. was a 14-year-old, 8th grade student attending Haggard Middle School. Haggard Middle School (the "School") is a Texas public school in Plano, Collin County, Texas, zoned as part of Plano Independent School District (the "District"). For all schools within its boundaries, the District is responsible for promulgating and enforcing student disciplinary rules in accordance with the Texas Education Code. TEX. EDUC. CODE § 37.001. But, as indicated by the following facts of this case, there are times when a school district's attempt to enforce its disciplinary authority goes too far and violates the rights of the very students it is charged with protecting.

## I.     The Bullying Incident

On Friday, February 12, 2021, A.V. invited a fellow classmate, S.H., to a sleepover at A.V.'s home in celebration of A.V.'s birthday. A.V. lived with his father, Aaron Vann. The sleepover began after Friday's school day had ended, was held off-campus, and was wholly unrelated to any school activity.

The next day, on Saturday, February 13, 2021, several other classmates joined A.V. and S.H. for a second day of the sleepover.[2] The boys spent the day playing video games and shooting

---

case; a witness's appearance, demeanor, and manner of testifying while on the witness stand; a witness's apparent candor and fairness, or lack thereof; the reasonableness or unreasonableness of a witness's testimony; the opportunity of a witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which a witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail. When necessary, the Court comments on the credibility of a witness or the weight given to a witness's testimony.

Finally, during trial, the Court may have carried various objections made by the parties to certain pieces of evidence. To the extent the Court refers to such evidence, the objection is overruled if the Court has included and relied on it. If the evidence was not included, this means the Court either overruled the objection or determined that the evidence was unnecessary for the findings and conclusions made here.

[2] While the District and Court agree there is no evidence that A.V.'s conduct that night was racially-motivated, the

BB guns at one another.[3] Then, at some point in the evening, S.H. fell asleep. Around midnight, A.V., either joined by or observed by the other boys, urinated in a cup, slapped a groggy S.H. awake, and caused S.H. to drink from the cup (the "incident").[4] One of the classmates, M.Y., recorded the incident on his cellphone.

The video shows the acts as described above. What the video does not show is of equal importance. The video does not show any evidence that A.V. was aware his acts were being recorded. Other than appearing as the subject of the video, A.V. never looked at the camera, waved or acknowledged the camera, or made any statement indicating that he knew his acts were being recorded. Additionally, the video does not show A.V. using a cellphone or any other kind of electronic device to bully S.H.

## II.    The Disagreement between M.Y. and S.H. [5]

Approximately two weeks after the sleepover, S.H. got into an argument with M.Y. While the two were playing an online game, they exchanged a heated series of insults. M.Y. escalated the argument to a grossly inappropriate level by calling S.H. the "N-word" multiple times, and threatening to beat up S.H. at school. M.Y. then told S.H. about the existence of the video.

After the argument had ended, M.Y. used the social media application Snapchat to distribute the video among the School's student body. For the sake of clarity, A.V. was not present during the argument between M.Y. and S.H., nor involved in M.Y.'s distribution of the video.

After the argument with M.Y. and M.Y.'s distribution of the video, S.H. no longer wanted

---

[3] fact that S.H. was the only Black student present is important to give context to the following events.
There are some allegations in the record that one of the students present excessively targeted S.H. with BB gun pellets. However, these allegations were not directed at A.V., nor were they the alleged basis for his discipline. Thus, the Court makes no factual finding on this matter.
[4] Throughout this opinion, "incident" is used to refer to the events occurring the evening of February 13, 2021, specifically when A.V. slapped S.H. awake and caused S.H. to drink urine.
[5] This opinion is in no way attempting to diminish, excuse, or ignore any racism that S.H. experienced at the hands of students other than A.V. However, for the purpose of this opinion, the Court must focus on the evidence as it relates to A.V. and his case against the District.

to go to school. On March 1, 2021, when questioned by his mother, Ms. Smith, S.H. cited the online conflict with M.Y. as the reason he was unwilling to attend school; S.H. did not tell his mother about the video or the incident at the sleepover. The next day, Ms. Smith sent S.H. to school, then reported her son's concerns to the School's Assistant Principal, Linda Washington ("Washington"). When Washington pulled S.H. aside to discuss the matter, S.H. reported that he was feeling scared and unsafe. S.H. showed Washington the video of the incident. However, S.H. reported that he "was not all that upset" about the incident that had occurred at A.V.'s sleepover, but "was more concerned and angry" about the argument with M.Y. and was rightfully "very upset" about M.Y.'s comments.

### III.    The School's Initial Response

Washington shared S.H.'s concerns with Ms. Smith. Then, after a meeting with the School's resource officer, Ms. Smith submitted a report to the Plano Police Department. The Plano Police Department opened an investigation into the incident and wrote an initial report dated March 3, 2021. Under "Violations" the report lists "Assault-Bodily Injury," and states "No" under "Bias Motivation." As of the date of the trial, the Plano Police Department's investigation was still ongoing.

From March 2–3, 2021, Washington and other school officials conducted interviews with each student who was present at the sleepover.[6] At the end of the March 3rd school day, Washington notified A.V. that he was receiving three days of out-of-school suspension as discipline for cyberbullying.[7] In addition, A.V. received a "Stay-Away Agreement," ordering that

---

[6] Due to this matter involving minors, the Court will not disclose any disciplinary measures taken against the other students involved in the incident.

[7] A.V.'s out-of-school suspension was issued on Wednesday, March 3, 2021 and began the following day. Because the investigation continued into the School's Spring Break, A.V.'s third and final day of the suspension was not served until Monday, March 15, 2021.

4

A.V. make no contact with S.H. during the school day or during any school-sponsored event. The Stay-Away Agreement was effective through May 27, 2021, and noted that no other disciplinary actions were issued at that time.

## IV.    The Community's Response

Ms. Smith was dissatisfied with the School's discipline of the students involved in the incident. So, on March 4, 2021, Ms. Smith shared the video of the incident on social media. When Ms. Smith described the events, she blamed the School and the District for ignoring A.V.'s and the other classmates' use of racial slurs, and maintained that S.H. had been bullied because of his race. Ms. Smith's posts went viral, spreading quickly and widely over the Internet within a matter of hours.

Like a digital wildfire, Ms. Smith's posts about the incident and the video on social media caused an uproar in the community. The community was outraged about what had happened to S.H., and upset about the District's discipline of the students involved. In no time, the community rallied and organized a protest at the School for that afternoon. According to the School's Principal, Shauna Koehne, in her seventeen years of experience dealing with bullying incidents at the School, this was the first time that an incident between students had caused a public protest.

As Ms. Smith's posts continued to spread, the School was flooded with phone calls and e-mails from the general public. The administration, including those directly involved with investigating the incident and issuing discipline, received threatening messages and had their personal phone numbers, e-mails, and addresses shared on the Internet. Thousands of social media posts and messages were sent to administration and students, which some administrators described as mean, disrespectful, hateful, and accusatory. Specifically, many commenters accused the District and those in charge of its disciplinary decisions of being racist.

Parents began to pick up their children early due to safety concerns. Aaron Vann's home became the site of daily harassment and protests. Washington received threats of bodily harm and death, including threats to shoot her and her son. She reported being flooded with thousands of e-mails daily from people all over the world, beginning on March 4, 2021 and continuing for months. The District's Superintendent, Sara Bonser ("Bonser"), also received messages threatening her physical safety, including death threats and intimidation. To put it lightly, the community's response was out of control.

## V.     The School's Reaction

At the start of its investigation, the School initially considered that it lacked authority to further discipline the students for the incident because the incident occurred off-campus and was unrelated to any school activity. However, as the investigation and protests continued, and the pressure from the community swelled, the School changed course.

On March 5, 2021, the community again organized a protest to occur at the School. After the event, the School took action and e-mailed a bullying investigation notice letter to A.V. and his parents. Then, on March 9, 2021, Bonser participated in a news conference with the Plano Mayor and Chief of Police. In the news segment, Bonser stated: "bullying, harassment, threats, and acts of racism against Plano ISD students are abhorrent and will not be tolerated. There is nothing okay about harassment. There is nothing okay about bullying. And there is nothing okay about any act of racism . . . whether it happens on campus or off-campus." Bonser then referenced the video of the incident, assuring that it would be addressed "appropriately and swiftly." Never before had a superintendent of the District given a press conference about a student-on-student bullying situation.

On March 15, 2021, school administrators held a Campus Management Meeting with A.V.

and his parents. The School alleged that A.V. had violated the District's Student Code of Conduct by engaging in acts of cyberbullying against S.H. The anti-cyberbullying policy in the District's Student Code of Conduct is written pursuant to its authority under Texas Education Code § 37.0832, which allows a school to regulate off-campus bullying "done through the use of an electronic communication device" that "interferes with a student's educational opportunities" or "substantially disrupts the orderly operation" of the school. TEX. EDUC. CODE § 37.0832(a), (a–1). During this meeting, the School purportedly reviewed the evidence and the District's relevant disciplinary rules prior to forming a conclusion.

At trial, however, school administrators testified that there was no evidence A.V. recorded or distributed the video, or even had possession of the video prior to M.Y.'s distribution and Ms. Smith's publication. Yet, according to the School, A.V. "used an electronic communication device" to bully S.H. because A.V. appeared in the video that M.Y. recorded through a cellphone. Despite A.V.'s testimony that he had no knowledge the incident was being recorded, and despite A.V.'s parents protesting the lack of evidence, the School concluded that A.V.'s appearance and conduct in the video illustrated his "knowing and willing participation" in cyberbullying. School representatives further testified that the school environment was not disrupted until two weeks after the incident occurred when the video was distributed and published online. Regardless, the School concluded that A.V.'s bullying played a part in the disruption.

Notably, the School also found no evidence that any of A.V.'s behavior was racially-motivated or that A.V. targeted S.H. because of his race. The District notified Ms. Smith with this finding; however, while it was aware of the racism-concerned protestors harassing A.V. and his family, the District refused to hold a second news conference to update the general public, stating simply: "We have no legal obligation to do so."

7

Concluding the meeting, the School disciplined A.V. by ordering him to attend an off-campus Disciplinary Alternative Education Program ("DAEP"), to begin on March 16, 2021. Thus, in total, A.V.'s discipline for allegedly cyberbullying S.H. consisted of three-days out-of-school suspension and seventy-five days placement in DAEP.

## VI.    The Plaintiffs' Answer

Plaintiffs timely and properly appealed the School's disciplinary decision using the District's appeals process. The District upheld the decision. After exhausting their administrative remedies, Plaintiffs sued the District in the undersigned Court on July 2, 2021. Plaintiffs allege that the District's conduct violated the due process rights of both A.V. and Aaron Vann.

On July 8, 2021, Plaintiffs filed a Motion for Preliminary Injunction and requested that this Court order the District to discontinue any ongoing discipline of A.V. and immediately readmit him to the School's main campus pending a final determination by the Court of Plaintiffs' underlying Complaint. On August 5, 2021, the Court granted Plaintiffs' motion. The injunction prohibited the District from continuing to impose any discipline on A.V., including making A.V. attend DAEP. At the time of the injunction, A.V. had served fifty of the seventy-five days of his DAEP placement.

## CONCLUSIONS OF LAW

## I.    Jurisdiction and Venue

The Court has jurisdiction over the parties and over the subject matter of this action based upon the presence of a federal question. 28 U.S.C. § 1331. Contrary to the District's belief, "[s]chool officials do not possess absolute authority over their students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). "While 'it is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in

wisdom or compassion,' it is the role of federal courts to decide claims of constitutional violation." *Riggan v. Midland Indep. Sch. Dist.*, 86 F. Supp. 2d 647, 654 (W.D. Tex. 2000) (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975), *abrogated in part on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). If Plaintiffs sought merely to "relitigate in federal court evidentiary questions arising in school disciplinary proceedings," the Court would lack jurisdiction. *Id.* However, as discussed below, Plaintiffs have asserted constitutional claims sufficient to invoke this Court's jurisdiction. Venue is proper in this action because "a substantial part of the events or omissions" giving rise to Plaintiffs' claims occurred in the Eastern District of Texas. 28 U.S.C. § 1391(b)(2).

The Court will begin by addressing Aaron Vann's claim that the District violated his constitutional due process rights.

## II.    Aaron Vann's Claim

On the night of February 13, 2021, when the incident occurred, A.V. was in the privacy of Aaron Vann's home, and the incident occurred completely unrelated to A.V.'s education. Aaron Vann claims that the District interfered with his Fourteenth Amendment substantive due process rights when it reached into the privacy of his home to discipline his child for a matter that did not involve the School. Specifically, Aaron Vann claims the District violated his right to direct the upbringing of his child free from government intervention.

The Supreme Court has long recognized as fundamental the right of parents to direct and control the education and upbringing of their children. *See generally Meyer v. Nebraska*, 262 U.S. 390 (1923) (recognizing the concept that parents have a fundamental liberty interest in directing the upbringing and education of their children); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("[T]he

interest of parents in the care, custody and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *see also Ramie v. City of Hedwig Vill.*, 765 F.2d 490, 492 (5th Cir. 1985) ("The liberty interest in privacy encompasses two notions: the freedom from being required to disclose personal matters to the government and the freedom to make certain kinds of decisions without government interference."). Truly, a "parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968).

However, while the Constitution protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children," *Troxel*, 530 U.S. at 66, this right is not absolute. *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 136 (5th Cir. 2009); *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 933 (3d Cir. 2011). In the context of public education, the Due Process Clause does not recognize a parent's right "to dictate, control or direct every component of the educational process." *Jesuit Coll. Preparatory Sch. v. Judy*, 231 F. Supp. 2d 520, 531 (N.D. Tex. 2002), *vacated as moot*, No. 02-10174, 2003 WL 23323003 (5th Cir. Feb. 26, 2003); *see also Cornerstone Christian Schs.*, 563 F.3d at 136 (recognizing the parental right protects "choices regarding the type of education—*e.g.*, public, private or home-schooling . . . but not particular components of that education, such as participation in interscholastic athletics or enrollment in particular courses"). Rather, "when the state's interest relates to the provision of public education," a parent's right to direct the upbringing of their child can be "subject [ ] to reasonable regulation." *Cornerstone Christian Schs.*, 563 F.3d at 136. This is because a parent's right implicated under the Fourteenth Amendment must necessarily be balanced against a "state['s] interest in providing and regulating a state public education system." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 290 (5th Cir. 2001) (citing

*Yoder*, 406 U.S. at 213–14); *see also Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 141 S.Ct. 2038, 2048–59 (2021) (Alito, J., concurring) (discussing the history of *in loco parentis*).

Thus, when it comes to student discipline, there are "circumstances in which school authorities, in order to maintain order and a proper educational atmosphere . . . may impose standards of conduct on students that differ from those approved by some parents." *Gruenke v. Seip*, 225 F.3d 290, 304 (3d Cir. 2000). And unless the school's disciplinary policy directly and substantially interferes[8] with a parent's choice regarding the type of education their child receives, the policy will be upheld so long as it passes rational-basis review. *Littlefield*, 268 F.3d at 291; *Ingraham v. Wright*, 430 U.S. 651, 662 (1977) (stating a school may impose disciplinary measures "as is reasonably necessary for the proper education of the child and for the maintenance of group discipline") (internal quotations omitted); *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019) (finding the existence of a parent's "right to direct the education of their children . . . is not enough to trigger strict scrutiny").

Here, Aaron Vann claims that the District interfered with his ability to discipline his child for conduct that occurred in the home. However, he failed to show that the District's disciplinary decisions directly and substantially interfered with his right to discipline A.V. For example, Aaron Vann did not argue that the District "forced or prevented" him "from reaching [his] own disciplinary decision," or that the District's actions forced him "to approve or disapprove of [A.V.'s] conduct." *Snyder*, 650 F.3d at 934. Further, Aaron Vann failed to show that the District's cyberbullying policy or its disciplinary decisions were unrelated to a legitimate state interest. And to do so would be arduous as student safety and maintaining good order have long been recognized

---

[8] For example, the Third Circuit has held that "a conflict with the parents' liberty interest . . . will only be implicated if the state's action deprived them of their right to make decisions concerning their child, and not when the action merely complicated the making and implementation of those decisions." *Snyder*, 650 F.3d at 934 (citations omitted).

as legitimate state interests. *Littlefield*, 268 F.3d at 291; *Boykins v. Fairfield Bd. of Educ.*, 492 F.2d 697, 702 (5th Cir. 1974), *cert. denied*, 420 U.S. 962 (1975). The Court finds, therefore, that the District did not violate Aaron Vann's Fourteenth Amendment rights.

The Court now turns to A.V.'s claims that the District violated his constitutional due process rights.

### III.   A.V.'s Claims

A.V. claims that the District violated his due process rights by: (1) failing to provide constitutionally adequate procedures when disciplining him;[9] (2) disciplining him without evidence of the violation cited, and thus in excess of the District's authority; and (3) disciplining him under a Student Code of Conduct that is unconstitutionally vague and overbroad. The Court will address each in turn, beginning with A.V.'s procedural due process claims.

### A.  A.V.'s Procedural Due Process Claims

Procedural due process claims require a two-part analysis: (1) whether the plaintiff has a life, liberty, or property interest that is entitled to procedural due process protection; and (2) if so, what process is due. *Bd. of Regents v. Roth*, 408 U.S. 564, 569–70 (1972) (pointing out that the requirements of procedural due process apply only where a deprivation of an interest guaranteed by the Fourteenth Amendment has occurred); *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001); *Mitchell v. Beaumont Indep. Sch. Dist.*, No. 1:05-CV-195, 2006 WL 2092585, at *11–12 (E.D. Tex. July 25, 2006). The Court will begin by evaluating whether A.V. has a protected interest that is entitled to procedural due process protection.

---

[9] While unclear from the pleadings whether A.V. intended to bring a procedural due process claim as well as a substantive due process claim, both were discussed at trial. Thus, the Court will analyze A.V.'s claims for violations of both procedural and substantive due process.

**1. Whether A.V. has a protected interest that is entitled to due process protection.**

A.V. contends that the District deprived him of a protected interest by suspending him and subsequently placing him in DAEP, which damaged his reputation and scholastic record, and prevented him from participating on the School's football team.

First, A.V.'s claim that exclusion from the School's football program violated a Fourteenth Amendment right is without merit. "Students do not possess a constitutionally protected interest in their participation in extracurricular activities." *Doe v. Silsbee Indep. Sch. Dist.*, 402 F. App'x 852, 854 (5th Cir. 2010) (citing *NCAA v. Yeo*, 171 S.W.3d 863, 865 (Tex. 2005)); *see also Goss v. Lopez*, 419 U.S. 565, 574 (1975) (limiting a student's property interest to the educational process); *Mitchell v. La. High Sch. Athletic Assoc.*, 430 F.2d 1155, 1158 (5th Cir. 1970) (holding that "[t]he privilege of participating in interscholastic athletics must be deemed to fall . . . outside the protection of due process"). To be sure, "[t]he Fifth Circuit has rejected attempts to classify extracurricular activities as protected interests implicating the safeguards of due process." *McClelland v. Katy Indep. Sch. Dist.*, No. 4:21-CV-00520, 2021 WL 5055053, at *12 (S.D. Tex. Nov. 1, 2021), *notice of appeal filed*, No. 21-20625 (5th Cir. Nov. 30, 2021).

For similar reasons, A.V.'s claims of injury to his reputation and scholastic record, standing alone, could not prevail. *Stafford Mun. Sch. Dist. v. L.P.*, 64 S.W.3d 559, 563–64 (Tex. App.— Houston [14th Dist.] 2001). There is "no support for the proposition that reputation alone, apart from some more tangible interests . . . is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Parker v. Duffey*, 251 F. App'x 879, 883 (5th Cir. 2007) (citing *Wheeler v. Miller*, 168 F.3d 241, 249 (5th Cir. 1999)). This holding applies even where a student claims reputation damage due to "the stigma of being punished for something you did not do," such as A.V. does here. *Stephens v. Trinity Indep. Sch. Dist.*, No. 12-12-00094,

13

2012 WL 5289346, at *4 (Tex. App.—Tyler Oct. 24, 2012).

However, the Court reaches a different conclusion regarding A.V.'s interest in his education. The Supreme Court has recognized the right to an education to be a legally cognizable interest under the Fourteenth Amendment. *See Goss*, 419 U.S. at 574. For example, the Supreme Court recognized that students have an "undeniable property interest in a state-provided public education" that may not be deprived without due process of law. *Khan v. Fort Bend Indep. Sch. Dist.*, 561 F. Supp. 2d 760, 764 (S.D. Tex. 2008) (referencing *Goss*, 419 U.S. at 574). Here, A.V. claims that the District's disciplinary decisions infringed on his right to an education and to attend his "customary high school." The District disciplined A.V. through two manners: (1) seventy-five days placement in DAEP, and (2) three days of out-of-school suspension. But, while a suspension may arguably violate the right to education, the same cannot be argued for a DAEP placement.

To determine whether a student's right to education has been violated, courts apply a "total exclusion" standard: only when a student is "total[ly] exclud[ed] from the educational process" must the school provide him with "the procedural protections required by the Due Process Clause." *Swindle v. Livingston Par. Sch. Bd.*, 655 F.3d 386, 401 (5th Cir. 2011) (citing *Goss*, 419 U.S. at 576); *see also Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185, 245–47 (E.D.N.Y. 2018) (collecting cases). When applying this test to DAEP placements, courts have found no impact to a protected property interest implicating due process concerns. *Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 26–27 (5th Cir. 1997). This is because DAEP placements are not a "total exclusion" from the educational process as they still provide a student with some form of an education. *See generally Stafford Mun. Sch. Dist.*, 64 S.W.3d at 563 (citing *Goss*, 419 U.S. at 575) (referring to suspension or expulsion from school as a "total exclusion from the educational process," but not placement in an alternative schooling program). While DAEP

14

programs may provide a different education than the student is accustomed to at the student's "customary high school," "students do not have a protected right to a specific curriculum or to placement at a particular school; accordingly, an assignment to an alternative education program does not deprive a student of any protected property rights or liberty interests." *McClelland*, 2021 WL 5055053, at *12. A.V., therefore, cannot claim that the District's decision to place him in DAEP infringed on his right to an education. *Nevares*, 111 F.3d at 26.

On the other hand, the District's decision to discipline A.V. with a three-day suspension is sufficient to implicate A.V.'s protected interest against exclusion from the educational process. *See, e.g., Goss*, 419 U.S. at 573, 576 (ten-day suspension sufficient); *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011) (three-day suspension sufficient, but not subsequent forty-five-day assignment to DAEP); *Salas v. United Indep. Sch. Dist.*, No. L-08-22, 2009 WL 1035068, at *2 (S.D. Tex. Apr. 17, 2009) (same). On March 4, 5, and 15, 2021, A.V. was totally excluded from the educational process while he served an out-of-school suspension. *Cf. Smith v. Detroit Indep. Sch. Dist.*, No. 5:06-CV-262, 2009 WL 10708891, at *5 (E.D. Tex. Mar. 31, 2009) (no due process violation where student did not actually serve three-day suspension). As recognized in *Goss*, "the property interest in educational benefits temporarily denied" is not "so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary." 419 U.S. at 576. Accordingly, the Court finds that A.V. has successfully shown an entitlement to a protected property interest in his education. The Court must now examine whether the District violated that interest.

### 2. Whether the District provided A.V. with constitutionally-adequate procedures.

Because A.V. had a property interest in his education that was entitled to due process protection, the Court must now determine whether the District provided A.V. with the "minimum

15

procedures" required by the Fourteenth Amendment. *See Harris*, 635 F.3d at 690 ("[A] State may not withdraw" a student's right to an education "on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred") (internal quotations omitted).

The District suspended A.V. for three days. For a suspension of that length, "due process requires 'that the student be given oral or written notice of the charges against him, and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.'" *Garcia v. Vega Indep. Sch. Dist.*, No. 2:16-CV-00211, 2017 WL 395126, at *3 (N.D. Tex. Jan. 27, 2017) (quoting *Goss*, 419 U.S. at 581). The "opportunity to present his side of the story may be satisfied by an informal give and take between the student and the [disciplinarian] so long as notice effective to allow the student to respond has been given." *Riggan*, 86 F. Supp. 2d at 656 (citing *Goss*, 419 U.S. at 583–84).

The Court finds that the District provided A.V. with constitutionally-adequate procedures. A.V. and his parents were given written notice of the allegations and evidence against him. A.V. then had ample opportunity to be heard—the District held a Campus Management Meeting in which A.V. and his parents discussed with School administrators the allegations, evidence, and applicable rules of conduct. Even though this meeting was not a "formal, trial-type hearing[]," A.V. was "able to fully discuss the charges against [him] and present evidence [and argument] supporting [his] contentions." *Parker*, 251 F. App'x at 883. That is all the Due Process Clause requires in this situation. *Id.*

Thus, the Court holds that the District did not violate A.V.'s Fourteenth Amendment procedural due process rights. The Court will now consider whether the District violated A.V.'s substantive due process rights.

### B.  A.V.'s Substantive Due Process Claims

The substantive component of the Fourteenth Amendment Due Process Clause protects individuals against "certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (internal citation omitted). School districts, "no less than other state [actors], are subject to the commands of the [F]ourteenth [A]mendment." *Jones v. Latexo Indep. Sch. Dist.*, 499 F. Supp. 223, 229 (E.D. Tex. 1980).

"To prevail on a substantive due process claim, a plaintiff must first establish that he held a constitutionally protected right or property interest to which the Fourteenth Amendment's due process protection applies." *DeCossas v. St. Tammany Par. Sch. Bd.*, No. 16-3786, 2017 WL 3971248, at *22 (E.D. La. Sept. 8, 2017). As noted *supra*, A.V. has shown a cognizable Fourteenth Amendment interest in his education. But even where a protected interest is implicated, a court's review of a school's disciplinary decision for substantive due process violations is limited. *Id.*; *Jeffrey v. Bd. of Trs. of Bells ISD*, 261 F. Supp. 2d 719, 727 (E.D. Tex. 2003).

"In the context of school discipline, punishment does not implicate substantive due process concerns unless the action is 'arbitrary, capricious, [ ] wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning,'" *Bundick v. Bay City Indep. Sch. Dist.*, 140 F. Supp. 2d 735, 740 (S.D. Tex. 2001) (quoting *Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303, 305–06 (5th Cir. 1987)), an "abuse of discretion," or "in violation of law." *Wood v. Alamo Heights Indep. Sch. Dist.*, 308 F. Supp. 551, 552–53 (W.D. Tex. 1970); s*ee also FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996) ("[T]he power to decide, to be wrong as well as right on contestable issues, is both privilege and curse of democracy . . . [e]rgo, the due process clause does not require a state to implement its own law correctly, nor does the

Constitution . . . insist that a local government be right") (internal citations omitted). "In deference to the judgment of the school boards, [courts] refer ad hoc resolution of . . . issues [such as this one] to the neutral corner of 'reasonableness.'" *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 397 (5th Cir. 2015) (quoting *Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 971 (5th Cir. 1972)). Thus, "[r]eview and revision of a school suspension on substantive due process grounds [is] only [ ] available in a rare case where there [is] no 'rational relationship between the punishment and offense.'" *Brewer v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 264 (5th Cir. 1985) (citing *Mitchell v. Bd. of Trs.*, 625 F.2d 660, 664 n.8 (5th Cir. 1980)). This is a difficult standard for a plaintiff to overcome.

That said, it is possible for a school's interpretation of its rules to be so extraordinarily unreasonable as to violate a student's substantive due process rights. *See Bd. of Educ. of Rogers, Ark. v. McCluskey*, 458 U.S. 966, 970 (1982); *Snyder*, 650 F.3d at 928–31 (finding school's disciplinary decision unsupported by the facts and thus unreasonable); *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 686 n.16 (2010) (noting that while "determinations of what constitutes sound educational policy . . . fall within the discretion of school administrators and educators," the ultimate "question whether a [school] has exceeded constitutional constraints" rests with the courts and courts "owe no deference to [schools] when [they] consider that question"). "[E]ach case must be decided in its own particular setting and factual background and within the context of the entire record before the court in determining whether the rule or action . . . is arbitrary, capricious, [or] unreasonable[.]" *Ferrell v. Dall. Indep. Sch. Dist.*, 392 F.2d 697, 702 (5th Cir. 1968).

The facts here test the bounds of how far a school may go to protect some students and punish others consistent with the Due Process Clause of the Fourteenth Amendment. While it is

not for the courts "to consider whether [school disciplinary decisions] are wise or expedient,"[10] courts may question whether such a decision was "a reasonable exercise of the power and discretion of the school authorities." *Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966).

Thus, whether the District interpreted its statutory authority in a reasonable and nonarbitrary manner and found at least some evidence on which to enforce it, are questions appropriate for judicial consideration. Accordingly, the Court will begin by determining whether the District's interpretation of its cyberbullying policy is a reasonable interpretation of its authority under the law.

### 1. Whether the District's interpretation of its cyberbullying policy is reasonable.

An independent school district is a creature of the Legislature and "exercises only such powers as are delegated to it by the state." *Stout v. Grand Prairie Indep. Sch. Dist.*, 733 S.W.2d 290, 296 (Tex. App.—Dallas 1987); *see also Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 452 (Tex. 2008) ("An agency may adopt only such rules as are authorized by and consistent with its statutory authority") (internal citations omitted). While a school district has ample authority to suspend or expel students, "it is without authority to suspend a student for any act or conduct, unless, prior thereto, the [school] has promulgated a rule, regulation or policy generally covering such act or conduct for which the student is subject to being suspended." *Texarkana Indep. Sch. Dist. v. Lewis*, 470 S.W.2d 727, 733 (Tex. Civ. App.—Texarkana 1971).

In 2017, the Texas Legislature expanded a school's authority to discipline a student for

---

[10] To be clear, this opinion does not question the reasonableness of the District or the Legislature in adopting an anti-cyberbullying policy generally, but rather whether the District's interpretation of its policy was a reasonable exercise of its statutory authority. "The possibility of arbitrary action is not excluded by the existence of reasonable regulations. There may be arbitrary application of the rule to the facts of a particular case." *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961), *abrogation on other grounds recognized by Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020).

certain acts of bullying by enacting § 37.0832 of the Texas Education Code. TEX. EDUC. CODE § 37.0832. Section 37.0832, also known as "David's Law," requires school districts to adopt policies and procedures to address bullying and cyberbullying and sets out specific parameters for when a school may regulate each. Under this provision, which the District's Student Code of Conduct fully incorporates,[11] a school district's authority to discipline a student for bullying depends on 1) the type of bullying, 2) the location of the bullying, and 3) the impact of the bullying. For example, § 37.0832 defines "bullying" as:

> a single significant act or pattern of acts by one or more students directed at another student that exploits an imbalance of power and involves engaging in written or verbal expression, expression through electronic means, or physical conduct that satisfies the applicability requirements provided by Subsection (a–1), and that:
>
> (i)     has the effect or will have the effect of physically harming a student, damaging a student's property, or placing a student in reasonable fear of harm to the student's person or of damage to the student's property;
> (ii)    is sufficiently severe, persistent, or pervasive enough that the action or threat creates an intimidating, threatening, or abusive educational environment for a student;
> (iii)   materially and substantially disrupts the educational process or the orderly operation of a classroom or school; or
> (iv)    infringes on the rights of the victim at school[.]

TEX. EDUC. CODE § 37.0832(a)(1)(A). Section 37.0832(a–1) then limits a school's authority to discipline a student for physical bullying to acts that occur (1) on campus, or at a school-sponsored or school related activity on or off school property, or (2) "on a publicly or privately owned school bus or vehicle being used for transportation of students to or from school or a school-sponsored or school-related activity." *Id.* at § 37.0832(a–1).

---

[11] In pre-trial pleadings, the District admitted that it "did not invent the definition of cyberbullying, nor did [the District] determine whether off-campus cyberbullying is punishable – the Texas Legislature did. The definitions of bullying and cyberbullying, along with the requirement that these definitions be applied to off-campus conduct appear in Tex. Educ. Code § 37.0832. The District merely followed the law by following Chapter 37's definitions and requirements" (Dkt. #14 at ¶ 4.10).

In comparison, § 37.0832 expressly authorizes school districts to discipline for cyberbullying that occurs off-campus and unrelated to any school activity if the cyberbullying "(A) interferes with a student's educational opportunities; or (B) substantially disrupts the orderly operation of a classroom, school, or school-sponsored or school-related activity." *Id.* at § 37.0832(a–1)(3). The statute defines "cyberbullying" as:

> bullying that is done through the use of any electronic communication device, including through the use of a cellular or other type of telephone, a computer, a camera, electronic mail, instant messaging, text messaging, a social media application, an Internet website, or any other Internet-based communication tool.

*Id.* at § 37.0832(a)(2).

In this case, the District disciplined A.V. specifically for cyberbullying. At the heart of the parties' dispute is whether A.V. "used" an electronic communication device such that his conduct constitutes "cyberbullying" as defined by § 37.0832.[12] The District contends that "use" broadly includes students who "willingly and actively participate" in content captured or created by an electronic communication device. In other words, the District believes that a student who is simply caught on video bullying is "using" an electronic device and thus a cyberbully. For several reasons, the District's interpretation of the cyberbullying law is contrary to the plain meaning of the statute, arbitrary and capricious, and unreasonable under the circumstances of this case.

In cases involving construction of a statute, a court begins its analysis with the text itself. *Watt v. Alaska*, 451 U.S. 259, 265 (1981). "When faced with an undefined statutory term, [the court's] job is to apply the 'common, ordinary meaning'" of the term. *Camacho v. Ford Motor*

---

[12] In pre-trial pleadings, the District argued that it had authority to discipline A.V. based both on its cyberbullying provision and a provision prohibiting assault. However, in the School's notice of discipline to A.V. and at trial, the School cited cyberbullying as the reason for A.V.'s discipline. When a Court analyzes a potential restriction on a student's constitutional rights arising from a school disciplinary action, it relies only on the reasons the school originally provided to the student for their suspension. *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25–26 (1st Cir. 2020) (stating that in *Tinker*, "the Supreme Court considered only those justifications offered to the students when they were disciplined in assessing the permissibility of the speech restrictions") (citing *Tinker*, 393 U.S. at 509–10, 509 n.3). Thus, the Court will only consider the reasons originally provided to A.V. for his suspension.

*Co.*, 993 F.3d 308, 312 (5th Cir. 2021) (citing *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018)). "To do that, '[the court] may consider a variety of sources, including dictionary definitions, judicial constructions of the term, and other statutory definitions.'" *Id.* (citing *Colorado Cnty. v. Staff*, 510 S.W.3d 435, 448 (Tex. 2017)). Here, neither the District's Student Code of Conduct nor the Texas Education Code define "use", and no case exists in which a court has interpreted the meaning of "use" for the purpose of § 37.0832's cyberbullying definition. Thus, the Court will turn to the ordinary meaning of the word.

Black's Law Dictionary defines "use" as "[t]o make use of or to employ something." BLACK'S LAW DICTIONARY (10th ed. 2017). Similarly, Merriam Webster's Collegiate Dictionary defines "use" as "to put into action or service," "to employ," "to use or engage the services of," or "to make use of." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2017). This ordinary meaning of "use" is consistently applied by Texas courts in other contexts. *See, e.g., Tex. Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 206–07 (Tex. 2020) (government's "use" of tangible property under Texas Tort Claims Act); *Farmers Ins. Exch. v. Rodriguez*, 366 S.W.3d 216, 226 (Tex. App.—Houston [14th Dist.] 2012) ("use" of motor vehicle for insurance coverage); *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004) (government's "use" of personal property causing wrongful death, recognizing that "since 1973, we have consistently defined 'use' to mean 'to put or bring into action or service; to employ for or apply to a given purpose'").

A court applies the ordinary meaning of a word to a statute "unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result." *Camacho*, 993 F.3d at 312 (citing *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d at 838). There is no indication that § 37.0832 demands a more precise definition, or that the application of the ordinary meaning of "use" would lead to an absurd result. Cyberbullying requires the actor "use" an

22

electronic communication device. "User" is defined as a person or thing that uses something. *See* MERRIAM WEBSTER'S (11th ed.) (defining a "user" as "one that uses"). Thus, common sense dictates that in the most general sense, a user of an electronic communication device must, by definition, "use" an electronic communication device. Some examples of "use" of an electronic communication device can be found in the District's "Misuse of Technology" policy. Under this policy, students are prohibited from "using" an electronic device to "[s]end, post, deliver, or possess electronic messages . . . on or off school property, if the conduct causes a substantial disruption to the educational environment or infringes on the rights of another student at school." Other examples can be found in Texas Penal Code § 42.07 which David's Law amended to criminalize electronic harassment as a sister provision to § 37.0832. Section 42.07 prohibits an actor from "sending" or "transferring" electronic communications that are intended to harass the recipient. TEX. PENAL CODE § 42.07.

In application, then, "use" requires something more than passivity. *See, e.g., United States v. Aguilar-Alonzo*, 944 F.3d 544, 550 (5th Cir. 2019) (recognizing that in a variety of criminal contexts, the Fifth Circuit has "consistently interpreted the ordinary and natural meaning of the verb 'use' to require active employment of something, as has the Supreme Court"); *J.W. v. Desoto Cnty. Sch. Dist.*, No. 2:09-CV-00155, 2010 WL 4394059, at *4 (N.D. Miss. Nov. 1, 2010) (student caught physically holding or possessing cell phone was still "*using* his cell phone at school" in violation of school's cell phone use policy) (emphasis in original). In the cyberbullying context, as distinguished from physical bullying, the bullying act is accomplished by a bully's *active use* of a device or the Internet, and the consequences of cyberbullying stem from consequences of the bully's use of the device.

The textual history clues in § 37.0832's language support the logical conclusion that the

Legislature intended cyberbullying be treated as distinct from physical bullying. In 1969, the Supreme Court in *Tinker v. Des Moines Independent School District* famously recognized that unless a school can show that protected student speech causes a substantial disruption or interferes with a student's rights, the speech falls outside of a school's regulatory authority. 393 U.S. at 513; *see also Mahanoy Area Sch. Dist.*, 141 S.Ct. 2038 (recognizing *Tinker'*s application to both on-campus and off-campus speech). It is no coincidence that § 37.0832's limitation on a school's ability to regulate cyberbullying implements the substantial disruption language from *Tinker*—anti-cyberbullying legislation is, at its core, designed to combat disruptive speech and expressive conduct that occur electronically. Statutes addressing purely physical bullying were not sufficient to regulate cyberbullying because unlike physical bullying, "cyberspace knows no geographic boundaries . . . . [It] has an 'everywhere' and 'all the time' quality which bullying that occurs in the physical world generally lacks." Barry P. McDonald, *Regulating Student Cyberspeech*, 77 MO. L. REV. 727, 746 (2012). In fact, the District did not provide—and the Court could not find—a case other than this discussing a student who did not actively use a cellphone to commit some act—videotape, publish, record, comment, text, support online, etc.—but was disciplined for cyberbullying.[13] *See, e.g., I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 367 (5th Cir. 2019) (cyberbullying by posting photos and comments on Twitter); *Morrow. v. Balaski*, 719 F.3d 160, 164 (3d Cir. 2013) (cyberbullying by sending messages on MySpace); *Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493, 498–99 (1st Cir. 2021) (cyberbullying by sharing photos and comments through Snapchat); *Shen v. Albany Unified Sch. Dist.*, No. 3:17-CV-02478, 2017 WL 5890089, at

---

[13] In *Taylor v. Metuchen Public School District*, a New Jersey District Court dismissed a challenge against a school for its decision to discipline a student for "encouraging" another student to post an offensive caricature online. No. 18-CV-1842, 2019 WL 1418124 (D.N.J. Mar. 28, 2019). In *Taylor*, however, the student was disciplined not for cyberbullying, but for his role in general bullying conduct occurring on-campus and lying to school administrators for which the school was "permitted to—and indeed required to—restrict" under New Jersey law. *Id.* at *6.

\*9–10 (N.D. Cal. Nov. 29, 2017) (cyberbullying by "liking" or expressing approval of derogatory posts online).

Under this background and the ordinary definition of "use", the District's discipline of A.V. is problematic. The District claims that A.V. "used" an electronic device by "actively and willingly participating" in the making and recording of a video that depicted acts of physical bullying. But the District's interpretation does not comport with the plain language of the statute. The District reads into the text of the cyberbullying definition words that simply are not there. *See Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985). The plain language of the statute requires the actor "use" a device, not "participate" or "appear" in someone else's use of a device. Interpreters "must presume that a legislature says in a statute what it means and means in a statute what it says." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). It is thus contrary to settled law to presume that the Legislature intended something more than its plain language sets forth; yet that is what the District has done here.

The District attempts to justify its interpretation by arguing that "participate" means "to take part in" or "to have a part or share in something," and A.V. thus participated in the use of a device because he created the act that made the video possible. This argument is unavailing. The District's interpretation does not comport with the ordinary understanding of "use." For example, when applying the ordinary meaning of "use" for "use of a vehicle" and "use of property," the Texas Supreme Court held that "use . . . does not cause injury if it does no more than furnish the condition that makes the injury possible." *Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540,

543 (Tex. 2003) (citations omitted); *see also Kampen v. Am. Isuzu Motors, Inc.*, 119 F.3d 1193, 1198 (5th Cir. 1997), *reh'g en banc granted and vacated by* 130 F.3d 656 (5th Cir. 1997), (in the context of products liability, stating that "not every action taken in connection with the product is a 'use' of the product"). The Court sees no reason why a different application ought to apply here.

A further problem with the District's logic is that it would render meaningless the distinctions § 37.0832 makes when discussing a district's regulatory authority. A student who physically bullies another is a "bully." But under the District's interpretation, the moment that student's act is caught on camera, he becomes a "cyberbully." If cyberbullying was meant to include physical bullying, there would be no need for § 37.0832's distinction between a school's authority over off-campus cyberbullying and off-campus physical bullying, which the Texas Education Code delineates separately. If the Legislature had intended for a school's authority over off-campus cyberbullying to include physical bullying caught on camera, it would have included language to that effect. But the Legislature did not do so. And to imply such an interpretation would be absurd. "It is an elementary canon of construction that when Congress uses different terms, each term is to have a particular, nonsuperfluous meaning." *Silva-Trevino v. Holder*, 742 F.3d 197, 203 (5th Cir. 2014) (internal quotations omitted). If the Court were to adopt the District's interpretation of "cyberbully," the Legislature's express limitations on a school's authority over off-campus purely physical bullying would be rendered meaningless. This is a result the Court must avoid. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008); *see also Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex. 1991) (stating that courts must consider the consequences that would result from a desired construction and avoid absurd results).

The following extreme example demonstrates the absurdity of the District's interpretation. A crowd of students gather at a local park. The park is off-campus, the gathering occurs on a

weekend, and the gathering is unrelated to any school activity. Amongst the crowd, Student A, who is older and larger than Student B, begins to push and shove Student B and call Student B offensive names. One student, Student C, takes out his cellphone and begins to secretly film the events. No one, other than Student C, is aware the events are being filmed. At some point, Student C pans the camera view over towards the other students in the crowd who are watching the events unfold. Later that evening, Student C posts the video on a social media website. Under the District's logic, Student C, Student A, and every student seen in the video watching the fight are all cyberbullies and can be punished under the District's regulatory authority over off-campus cyberbullying.

Simply being caught on camera doing an act, without more, cannot transform physical conduct into the type of speech or expressive conduct that anti-cyberbullying legislation was designed to regulate. But this is the only argument the District advances to support the contention that A.V. engaged in cyberbullying—that his acts of physical bullying were recorded on a phone by another student.

The Court's holding today is not intended to define the exact boundaries of what is and what is not cyberbullying under § 37.0832; that is a job for the Legislature. But if the Court were to accept the District's interpretation, § 37.0832 would be given a palpably absurd and unreasonable meaning. If schools could categorically regulate all off-campus physical conduct that is impermissible on-campus, so long as the conduct is caught on camera, there would be no limit to a school's authority to control and discipline a student for acts done off-campus, outside of school hours, and unrelated to any school activity. This would directly conflict with the Legislature's intentional limitations on a school's regulatory authority under § 37.0832. The Court cannot accept such an irrational interpretation that erases the distinctions between a school's

authority over cyberbullying and physical bullying that the Texas Legislature and judicial precedent have so prudently established.

Therefore, the Court holds that the District's interpretation is arbitrary and capricious, and unreasonable as it is contrary to the plain meaning of the statute. The Court now turns to whether any evidence existed to support the District's finding that A.V. violated the rule against cyberbullying.

### 2. Whether the District's discipline of A.V. for cyberbullying was supported by evidence.

Findings of school agencies "when reached by correct procedures and supported by substantial evidence, are entitled to great weight." *Wells v. Dall. Indep. Sch. Dist.*, 576 F. Supp. 497, 503 (N.D. Tex. 1983) (citing *Ferguson v. Thomas*, 430 F.2d 852, 859 (5th Cir. 1970)); *Ball v. Kerrville Indep. Sch. Dist.*, 504 S.W.2d 791, 798 (Tex. Civ. App.—San Antonio 1973) (holding that before a school's judgment on "factual matters can be set aside, it is necessary to hold that the negative findings made by the [school] are not supported by substantial evidence, and that the evidence so conclusively required affirmative findings that the refusal to make them was arbitrary or capricious."). "Although 'substantial evidence' is a term of art in the area of review of administrative decisions, the standard has been likened to [ ] 'any rational basis'" when evaluating acts of school administrators. *Sanchez v. Huntsville Indep. Sch. Dist.*, 844 S.W.2d 286, 290 (Tex. App.—Houston [1st Dist.] 1992) (internal quotations omitted). Thus, a court is "not concerned with correctness" of a school's factual findings, "but with its reasonableness." *Id.*

At trial, the District was given ample opportunity to present evidence to support its case. Yet the only evidence the District could provide is that A.V. was caught on camera physically bullying another student. To be abundantly clear, his presence in the video was the *only* fact the

28

District relied on to conclude that A.V. "actively and willingly participated" in cyberbullying.[14]

The District admitted it had no evidence that A.V. himself used a cellphone to film the video or that he otherwise physically manipulated any kind of electronic device during the incident. There is no evidence or allegation that A.V. instigated the recording or controlled the device used to create the video. There is no evidence that A.V. possessed a copy of the video on his personal cellphone prior to M.Y. and Ms. Smith's distribution. The District admitted it had no evidence that A.V. distributed the video, shared the video with other students, or published the video online. *Bell v. Itawamba*, 799 F.3d at 385.There is no evidence that A.V. so much as encouraged the video be shared, distributed, displayed, or published online. *Taylor*, 2019 WL 1418124, at *6. There is no evidence that A.V. compelled M.Y. to record the video, compelled M.Y. to share the video amongst the students, or compelled Ms. Smith to post the video on the Internet. There is no evidence that A.V. knew his acts were in violation of the District's anti-cyberbullying policy. *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 624 (5th Cir. 2004). The District did not offer any evidence to the contrary. Were there any such evidence "out there," the record would contain it. There is simply no evidence that A.V.'s behavior, while crude and inappropriate, was the type of behavior the Legislature intended for a school to regulate under "use of an electronic communication device."

Even if "participation" were enough to constitute "use of an electronic device," there is no evidence to support a finding that A.V. "actively and willingly participated." At the very least, participation would require awareness. But there is no evidence that A.V. was even aware that

---

[14] The Court notes a repeated habit of hypocrisy in the District's arguments. After the District actively and willingly participated in the news conference where it made statements that the incident involved allegations of racism, A.V. claimed that he was the subject of a tirade of online threats, insults, and obscene remarks. In response, the District stated that it did not share the video of the news conference online, and could not be held responsible for third parties who independently chose to share the video online or comment about the video's contents. Yet those same facts as applied to A.V. are what landed him a three-day suspension and a seventy-five-day placement in DAEP.

M.Y. was recording the incident. In the video recording, A.V. never looks into the camera. A.V. never waves at or acknowledges the camera. A.V. never states anything during the recording that would indicate one way or the other whether he was aware his acts were being recorded. In fact, the only affirmative evidence on the record is A.V.'s statement that he was unaware M.Y. was recording the incident. All the District can rely on is its own assumption that A.V. must have been aware of the video because he is in it; but the evidence just as much supports such an assumption as it does a conclusion that A.V. was unknowingly recorded. Thus, other than the actions of another student deciding to film A.V., there is no evidence to support a finding that A.V. was aware he was being recorded or otherwise actively participated in the creation of the video. If an arbitrary and capricious decision is one that fails to "manifest a rational connection to the facts," *Oncor Elec. Delivery Co. LLC v. Pub. Util. Comm'n of Tex.*, 406 S.W.3d 253, 265 (Tex. App.—Austin 2013, no pet.), then the District's interpretation is exactly the type of absurd decision the Fourteenth Amendment prohibits.

So considering the overwhelming lack of evidence, the District's decision to punish A.V.— a student who physically slapped another student, but never used an electronic device—for cyberbullying, rather than physical bullying, is perplexing. But it is clear why the District chose to do so. The District admitted at trial that under current law, it did not have authority to punish A.V. for purely physical bullying that occurred off-campus and was unrelated to any school activity.[15]

---

[15] The Court is not attempting to question whether the Texas Legislature could constitutionally grant such authority to a school district, or the constitutionality of § 37.0832 generally, but instead whether this authority is currently granted to school districts under Texas law. That the Legislature intentionally chose to withhold a school district's authority to discipline a student for purely physical bullying occurring off-campus and unrelated to any school activity is evident from the Legislature's intentional grant of school district authority over other forms of off-campus physical conduct. *See, e.g.,* TEX. EDUC. CODE § 37.006(2)(c) (authorizing a school district to place a student in DAEP if the student received deferred prosecution for off-campus conduct defined under the Penal Code as a felony offense); § 37.007(a), (b) (differentiating between school district's authority to expel students for certain on-campus conduct or conduct occurring at a school-related activity, with school district's authority to expel students for certain conduct regardless of location). Neither the Court nor the District may read authority into a statute that the Legislature did not expressly grant. *See Sorokolit v. Rhodes*, 889 S.W.2d 239, 241 (Tex. 1994) (emphasizing that a court may not enlarge

Thus, but-for the fortuitous occurrence that A.V.'s conduct was caught on video, A.V.'s discipline was beyond the reach of the District.

At the time, however, the District was placed in a difficult situation. The District was deluged with daily protests, death threats, accusations of turning a blind eye to racism, and masses of phone calls and e-mails, many of which personally attacked School and District administrators for not doing enough to discipline the students involved in the incident. It was under this growing pressure that despite finding A.V. did not record, distribute, or publish the video, that A.V.'s presence in the video became fact enough for the District to claim his "participation" in the use of an electronic device, and discipline him for cyberbullying. While the Court is not "insensitive to the difficulties faced by school officials in attempting to curb disorderly interferences with . . . education," *Lee v. Macon Cnty. Bd. of Ed.*, 490 F.2d 458, 460 (5th Cir. 1974), a school district cannot read into a statute more authority than was given just because of community pressure. Therefore, the Court finds the record completely devoid of evidence to support a finding that A.V. "used" an electronic device.

Further, the Court doubts whether there is any evidence that A.V.'s conduct was responsible for the "substantial disruption" to the school environment. *See* TEX. EDUC. CODE § 37.0832(a–1)(3) (limiting a school's authority over off-campus cyberbullying based on the effect of the act). As discussed, to discipline a student under Texas's cyberbullying statute, a school must find that the student's use of an electronic device either interfered with another student's educational opportunities or caused a substantial disruption to the school environment. *Id.*; *Tinker*, 393 U.S. at 513. Here, the District claims the latter. "[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially

the unambiguous language of a statute beyond its ordinary meaning).

disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the [C]onstitution[]." *Tinker*, 393 U.S. at 513. The substantial disruption standard is satisfied where the school shows the student's conduct "either caused an actual disruption or reasonably could be forecast to cause one." *Bell v. Itawamba,* 799 F.3d at 397; *Shanley*, 462 F.2d at 974. Considering the deference given to a school district's findings on this matter, the question again becomes whether the District's finding was reasonable. *Id.*

Some courts have found that a substantial disruption can be based on participation in group bullying. *See, e.g., Hopkinton Pub. Schs.*, 19 F.4th at 507–08; *Shen*, 2017 WL 5890089, at *9. However, unlike A.V., the students in those cases each actively used an electronic device to encourage cyberbullying by other group members. *Id.* Further, District and School representatives testified at trial that there was no disruption until the video was distributed and published online, and that S.H.'s reluctance to attend school was primarily caused by S.H.'s argument with M.Y. and M.Y.'s possession and distribution of the video. Lastly, the Texas cyberbullying statute appears to require the disruption be caused by the student's use of an electronic device. *See* TEX. EDUC. CODE § 37.0832(a)(2), (a–1) (school has regulatory authority over off-campus cyberbullying where the cyberbullying—i.e., bullying done through the use of an electronic device—causes a substantial disruption or interferes with a student's education). With no evidence that A.V. used an electronic device, it would be unreasonable to conclude that evidence exists showing that A.V.'s use of an electronic device caused a substantial disruption.

In summary, this discussion is not intended to minimize the high degree of deference given to school disciplinary decisions. *See A.M. ex rel McAllum v. Cash*, 585 F.3d 214, 222 (5th Cir. 2009). Nor is it intended to minimize A.V.'s misconduct or excuse his actions. A.V.'s conduct was inappropriate and crude. He physically bullied S.H. by slapping him awake and forcing S.H. to

drink urine. But in no moment did A.V. bully S.H. through the use of an electronic device.

"Freedom from punishment in the absence of personal guilt is a fundamental concept in the American scheme of justice." *St. Ann v. Palisi*, 495 F.2d 423, 425 (5th Cir. 1974). While schools have considerable disciplinary discretion, this discretion is not absolute, *Tinker,* 393 U.S. at 506, and rewarding a school for disciplining a student for a violation he did not commit is precedent this Court is unwilling to set. Surely, if students "do not shed their constitutional rights at the schoolhouse door," *Tinker*, 393 U.S. at 506, neither can it be said that students shed their constitutional rights in the confines of their own home.

The Court holds that the District's enforcement of its cyberbullying provision was arbitrary and capricious, and unreasonable under the law and facts of this case, and therefore violated A.V.'s substantive due process rights.

The Court will lastly address A.V.'s claim that the District's Student Code of Conduct is unconstitutionally vague.

### C.  Vagueness[16]

A.V. argues that the District's Student Code of Conduct is unconstitutionally vague because the Code does not provide adequate notice of when the "interests of the district" apply so as to allow the District authority over off-campus conduct.

"A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Cash*, 585 F.3d at 224–25 (citations omitted). While

---

[16] Plaintiffs initially raised an overbreadth challenge in addition to raising a vagueness challenge. However, the overbreadth doctrine "is applicable only to First Amendment challenges," and Plaintiffs did not assert a First Amendment challenge in this case. *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009). Thus, the Court finds it unnecessary to address this claim as the application of the District's cyberbullying provision as applied to the facts of A.V.'s case has been discussed in full. *See United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("[C]hallenges to statutes which do not involve First Amendment claims must be examined in light of the facts of the case at hand.").

students may challenge school disciplinary policies based on their alleged vagueness, the standard is heightened in the school context. "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986). "Thus, facial vagueness challenges—especially of school regulations—are not easily won." *S.N.B. v. Pearland Indep. Sch. Dist.*, 120 F. Supp. 3d 620, 626 (S.D. Tex. 2014).

Here, A.V.'s vagueness challenge "is, ultimately, a due process claim." *McClelland*, 2021 WL 5055053, at *11 (citing *Cash*, 585 F.3d at 225). "Objections to vagueness under the Due Process Clause rest on lack of notice and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Contrarily, a plaintiff may prevail on a vagueness claim brought under the Due Process Clause if he can prove that the challenged policy is "impermissibly vague in all of its applications, including its application to the party bringing the challenge." *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009) (internal quotations omitted); *Hinterlong v. Arlington Indep. Sch. Dist.*, No. 2-09-050, 2010 WL 522641, at *2 (Tex. App.—Fort Worth Feb. 11, 2010). A policy is impermissibly vague where "it subjects the exercise of a right to an unascertainable standard, or if, in other words, men of common intelligence must necessarily guess at its meaning." *Clark*, 582 F.3d at 613 (internal quotations omitted).

A.V. failed to overcome the heightened burden a challenge against school disciplinary provisions invites. *S.N.B. v. Pearland Indep. Sch. Dist.*, 120 F. Supp. 3d at 626. The District's Student Code of Conduct, when read as a whole, gives adequate warning of when the "interests of the District" apply. The cyberbullying and bullying provisions discussed above exemplify this as

34

the definitions of each limit the District's authority by location, type of act committed, and impact of the act. Considering just these limitations, the Court cannot find that the District's Student Code of Conduct is "impermissibly vague in all of its applications." *Clark*, 582 F.3d at 612.

## CONCLUSION

The Court, having made its Findings of Fact and Conclusions of Law, finds in favor of Plaintiff A.V. on his claim that Defendant violated A.V.'s substantive due process rights because the Defendant's interpretation and application of its policy was arbitrary and capricious, and unsupported by the law and facts of this case. The Court otherwise finds in favor of Defendant Plano Independent School District on Plaintiffs' other claims.

It is **FURTHER ORDERED** that the parties shall meet and confer to establish a post-trial briefing schedule on the issue of damages and any other relief requested that was not resolved through this Order within five days of this Order. After meeting and conferring, the parties are further directed to submit a proposed briefing schedule to the Court.

**IT IS SO ORDERED**.

 **SIGNED this 14th day of February, 2022.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE